IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TASHIMA SESSION, <br><br> Plaintiffs, <br><br> vs. <br><br> MENASHA CORPORATION, <br><br> Defendants. | Case No. 22-cv-1385-SPM |

## MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

Pending before the Court is a Motion for Summary Judgment filed by defendant, Menasha Corporation ("Menasha"), along with supplement that includes statement of facts, and supporting memorandum of law. (Docs. 44-46). For the reason's set forth below, the Court **GRANTS** the Motion for Summary Judgment.

This action arises from the employment of Plaintiff Tashima Session ("Session") at Menasha (Doc. 10). In her amended complaint, Session brought claims of sexual harassment, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964 (Doc. 10-1*).* Session claimed that she was sexually harassed by fellow employee, Raven Tandy, on several occasions, and when reported, she was subjected to a hostile work environment. (*Id.*). As a result, Session contended that her work performance was affected because she was sad, mad, and humiliated. (*Id.*). She further contended that she had a "tremendous" decrease in her pay. (*Id.*).

## FACTUAL BACKGROUND

Menasha filed its statement of uncontroverted material facts contemporaneously with its motion for summary judgment. (Doc. 45). The facts consisted of fifty-nine (59) numbered paragraphs under four separate subheadings. (*Id*). In accordance with Rule 56(c)(1)(A) of the Federal Rules of Civil Procedure, Menasha cited to specific portions of the record to support its contention that each and every fact alleged was material and undisputed (*Id.*).

In her response to the motion for summary judgment, Session disputed each and every one of the fifty-nine facts propounded by Menasha. (Doc. 50, pp. 6-7). However, she failed to cite to specific portions of the record to support her contentions, instead, she referred each of the disputed allegations to her own documents. (*Id.*)

In an effort to exclude immaterial and irrelevant facts, this Court has prepared its own Statement of Facts based upon the briefs provided by the parties herein including any attached exhibits and/or depositions. This section is limited to those facts which would be admissible at trial and which are adequately supported and material to the issues in this case.

Menasha Corporation is located in Neenah, Wisconsin. (Doc. 45, ¶1). At all relevant times, Menasha had two packaging facilities in Edwardsville, Illinois. (*Id.*, ¶2). Elite Staffing, Inc. ("Elite") is a temporary employment service and staffing agency which offers temporary employment service to Menasha and others. (*Id.*, ¶3).

On January 3, 2019, Session applied for employment with Elite, and she was ultimately hired by Elite. (*Id.*, ¶¶4,5). Session was an Elite employee and Menasha had no involvement in the hiring of Session. (*Id.*, ¶¶6,7). On July 25, 2019, Elite assigned

Session to perform services as a temporary line worker at one of Menasha's facilities in Edwardsville. (*Id.*, ¶8). Session was not trained by Menasha, but she recalls putting stuff on the line, opening up boxes, dumping out the products, and counting different things. (*Id.*, ¶9).

Elite was responsible for issuing discipline to its employees assigned to Menasha, including whether to terminate employment from Elite. (*Id.*, ¶10). Session's paychecks were from her employer, Elite, even when she was assigned to the Menasha facility. (*Id.*, ¶¶11, 12). While Session was assigned to Menasha, she was not required to work a set schedule nor was there an attendance policy. (*Id.*, ¶13).

Elite employed a manager, Jon Yates, who was assigned to Menasha. (*Id.*, ¶14). Yates had a designated workspace at Menasha and was responsible for managing all personnel issues involving Elite employees placed at Menasha. Yates was Session's supervisor at Menasha, and she reported any concerns at Menasha to him. (*Id.*, ¶15). Session submitted many handwritten complaints while assigned to Menasha, most of which were on "Elite" letterhead. (*Id.*, ¶16).

During Session's assignment at Menasha, she worked with female Line Lead, Raven Tandy. (*Id.*, ¶17). The Line Leads were responsible for helping out on the line and making sure the line ran properly. (*Id.*, ¶18). Session and Tandy never spoke to each other. (*Id.*, ¶19). Session thought Tandy was scary looking with intimidating eyes. (*Id.*, ¶20).

Session's complaints were almost always handwritten, not verbal. (*Id.*, ¶21). Session's first written complaint about Tandy was in December 2019 when she alleged that Tandy came up behind her, put her hands on both of Session's shoulders, and

rubbed her hands down Session's arms all the way to her wrists. (*Id.*, ¶22). Session did not know if her sex had anything to do with Tandy touching her, but it was the only time Tandy ever touched her. (*Id.*, ¶¶23, 24).

On September 18, 2020, Session went to the Pontoon Beach Police Department and reported to an Officer Warrant that she was uncomfortable working around Tandy because Tandy stared at her and rubbed her arms on one occasion. (*Id.*, ¶25). Session was told to speak with management about the situation. (*Id.*). The police department also called Elite's site supervisor, Yates, about Session's complaints. (*Id.*). because Yates told Session that he had spoken with Officer Warren about Session's complaints.

On September 21, 2020, Session handwrote an incident report complaining that "Tandy was staring at her from behind", which made her feel uncomfortable. (*Id.*, ¶26). Session did not know if Tandy was staring at her because of her sex, but said the stares were "lustful", or "thinking about, you know, other things, certain things". (*Id.*, ¶¶27, 28).

On September 22, 2020, Session handwrote another incident report complaining that Tandy and three other employees were responsible for Elite removing her from line lead training and that those employees made her feel unwanted and intimidated. (*Id.*, ¶29). In the report, Session complained that she was removed from line leader training for "no righteous or professional reason", but then testified that she did not know why she was removed from the training. (*Id.*, ¶31). Session suggested if her sexual orientation was the same as the other individuals, she probably would have been accepted, but then she also testified that she did not know the sexual orientation of the other individuals she complained about. (*Id.*, ¶¶29, 30). Session speculated that Tandy

went "different ways" and that if she [Session] was interested in women, "everything would have been cool.". (*Id.*, ¶30).

Session completed another handwritten statement on September 22, 2020, asserting that Tandy's "harassment and behavior" created a hostile environment that made her feel unwelcome and unwanted, which caused her to miss several days of work and incur financial loss. (*Id.*, ¶32). In her third statement dated September 22, 2020, Session complained that she was sexually harassed by Tandy on several occasions, that Tandy stared at her on September 18, 2020, and that Tandy worked with others to remove her from line lead training. (*Id.*, ¶33). Session contended that Tandy's staring was sexual in nature, but that she was not close enough to touch. (*Id.*, ¶34).

On September 24, 2020, Yates spoke with Tandy regarding Session's complaints. (*Id.*, ¶35). During that meeting, Tandy read Elite's Equal Opportunity Policy, Anti-Harassment Policy, and Complaint Procedure, and acknowledged that she would abide by Elite's procedures. (*Id.*). Yates also gave Tandy a final warning. (*Id.*).

On September 29, 2020, Session handwrote four statements. The first was about an incident from September 24, 2020 when she claimed that Tandy ran behind her to speak with two coworkers, which scared her and made her feel like her life was threatened. (*Id.*, ¶36). Session did not think this incident was sexual harassment. (*Id.*, ¶37).

The second was about an incident from September 25, 2020 when Tandy came on the line she was working, making Session feel uncomfortable and making it hard for her to concentrate on her job; however, when Session turned her head toward Tandy, Tandy

moved quickly. (*Id.*, ¶38). Session thought this was sexual harassment because Tandy was close to her. (*Id.*, ¶39).

The third was about an incident on September 26, 2020 in which two supervisors, Mr. Orlando and Mrs. Juanita, along with a third employee, Mark, did not let her work on a Saturday. (*Id.*, ¶40). Session claimed Tandy made a comment regarding workers arriving to work on time and said Mr. Orlando gave her "hard looks" and tried to intimidate her. (*Id.*). Session admitted this incident was not sexual harassment. (*Id.*, ¶41).

The fourth was about an incident on September 29, 2020 when she was assigned to work on Tandy's line because Yates told her no other lines were available. (*Id.*, ¶42). Session testified that Yates told her he had addressed her claims and had spoken with Officer Warren. (*Id.*). Session thinks other individuals witnessed the harassment, but cannot recall any of their names. (*Id.*, ¶43).

On October 7, 2020, Session sought a stalking/no contact order in the Third Judicial Circuit, Madison County, Illinois. (*Id.*, ¶45). On April 8, 2021, the Madison County Court heard and denied the verified petition, finding that Session failed to meet her burden. (*Id.*).

Session did not make any further complaints to Elite or Menasha about Tandy's behavior or purported sexual harassment until March of 2021. (*Id.*, ¶44). On March 9, 2021, Session handwrote a statement about an incident that occurred on March 8, 2021 when Tandy was watching Session work on line 13 while Tandy was working on line 12. (*Id.*, ¶46). Session also complained that she caught Tandy looking at her for a long period of time. (*Id.*).

On this same date, Session complained about another incident from March 2021 when she was accidentally placed on Tandy's line one morning. (*Id.*, ¶47). Session complained that she felt "totally disrespected and humiliated" when Tandy told her they are not permitted to work on the same line. (*Id.*). Session did not think this incident was sexual harassment. (*Id.*, ¶48).

Session wrote another statement on March 9, 2021. (*Id.*, ¶49). Session complained that even though the staff had been trying to keep her and Tandy separated, that Tandy and Wayne Marshall continued to schedule their lunches and breaks at the same time and that Tandy would sit close to her any try to intimidate her. (*Id.*). Session did not know whether she considered these events to be sexual harassment. (*Id.*, ¶50).

On March 9, 2021, Session handwrote another statement asking someone to make sure that Tandy did not have lunch and/or breaks at the same time she did. (*Id.*, ¶51). She also complained in one statement about another employee, John, who "got all in [her face] and told her that Tandy was trying to avoid her. (*Id.*, ¶54).

None of Session's statements mentioned Tandy and her friends putting their pinky finger to their cheeks and smiling at her, although she testified it caused her to go into "a rage". (*Id.*, ¶55). During the rage, Session called the police to Menasha because she refused Yates' directive to leave the property, so she was escorted off the property. (*Id.*, ¶56).

## LEGAL STANDARD

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055 (7th Cir. 2014) (quoting

Fed. R. Civ. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. P. 56(e); s*ee Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Stated another way, the nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003) *(*citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.,* 275 F.3d 654 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). However, no issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *See Faas v. Sears, Roebuck & Co.*, 532 F.3d 633 (7th Cir. 2008). The nonmovant cannot simply rely on its pleadings; the nonmovant must present admissible evidence that sufficiently shows the existence of each element of its case on which it will bear the burden of proof at trial. *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311 (7th Cir. 1995) (*citing Serfecz v. Jewel Food Stores*, 67 F.3d 591 (7th Cir. 1995); *Greater Rockford Energy and Technology Corp. v. Shell Oil Co., 998 F.2d 391 (7th Cir. 1993))*. Furthermore, the mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead the nonmovant must present definite, competent evidence in rebuttal. *Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004).*

The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and in opposition to

the motion for summary judgment. *White v. City of Chicago,* 829 F.3d 837, 841 (7th Cir. 2016). In the employment discrimination context, summary judgment is warranted where "the evidence, interpreted favorably to the plaintiff, could not persuade a reasonable jury that the employer had discriminated against the plaintiff." *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1570 (7th Cir. 1989).

## ANALYSIS

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* as amended, prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. *Coleman v. Donahoe,* 667 F.3d 835, 845 (7th Cir. 2020). Title VII forbids an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions or privileges of employment, because of such individual's race. 42 U.S.C. § 2000e(2)(a).

### I. Joint Employment

Menasha claims it is entitled to summary judgment on both of Session's claims because Menasha was not, in fact, her employer. Before proceeding with her claims under Title VII, the Plaintiff "must prove the existence of an employment relationship." *Love v. JP Cullen & Sons, Inc.,* 779 F.3d 697, 701 (7th Cir. 2015). A plaintiff may have multiple employers for the purpose of Title VII liability. *See Tamayo v. Blagojevich,* 526 F.3d 1074, 1088 (7th Cir. 2008). It has also been established that a person may bring an employment claim against an entity that is not her *direct* employer in "certain limited circumstances." *Love,* 779 F.3d at 701. In assessing whether this relationship exists, the Court considers (1) the extent of the

[alleged] employer's control and supervision; (2) the kind of occupation and nature of skill required, including whether skills were acquired on the job; (3) the employer's responsibility for the costs of operation; (4) the method and form of payment and benefits; and (5) the length of the job commitment. *Love*, 799 F.3d at 702 (citing *Knight v. United Farm Bureau Mutual Insurance Co.*, 950 F.2d 377, 378-79 (7th Cir. 1991)).

The first factor, the employer's right to control and supervise, is the most important consideration in this inquiry. *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 929 (7th Cir. 2017). This factor unquestionably points to Elite Staffing as Session's sole employer. Menasha did not have a say in interviewing or hiring Session, nor her placement at their facility. (Doc. 45-3, pp. 38-40; pp. 104-05). Elite Staffing set Session's work schedule, pay, and ultimately held the discretionary authority to discharge her. (Doc. 45-2, pp. 7-9).  Elite Staffing also employed an on-site manager, Jon Yates, who was responsible for overseeing Elite's temporary workers and addressing personnel matters concerning them, including Session's reports of sexual harassment (Doc. 45-2, pp. 10).

The second factor for determining joint employer status—type of occupation and skills required—also weighs against a finding of joint employment with Menasha. In order to evaluate this factor, we look at the type of occupation and the nature of the skills required for the position, including whether those skills were obtained in the workplace. *Frey v. Hotel Coleman*, 903 F.3d 671, 680 (7th Cir. 2018). Session's role at Menasha, which consisted of placing "stuff on the line," opening up boxes and "dump[ing] products out" does not constitute a skilled role. (Doc. 45-3, p. 107). Additionally, Session does not remember whether or not she had to undergo any training

before starting her temporary position at Menasha. (*Id.*) Whatever minimal training Session did or did not complete at Menasha would not prevent her from using those skills elsewhere. *Knight*, 950 F.2d at 379 (finding that while the plaintiff obtained training from her putative employer, because the plaintiff was free to leave the company at any time and use her skills elsewhere, this weighed in favor of finding that the company was not the plaintiff's employer). Therefore, the type of occupation and skills required to complete this task do not weigh in favor of a finding of an employment relationship between Menasha and Session.

The third *Knight* factor relates to whether the putative employer was responsible for the costs of operation. *Id.* at 378. No facts have been presented to contend that Menasha was responsible for the costs of Session's employment, and no argument has been made to the contrary from Menasha. Therefore, the Court will decline to analyze this factor.

The fourth factor—responsibility for pay and benefits—clearly shows that Elite was Session's employer. Elite was solely responsible for Session's wages and her paychecks came directly from Elite. (Doc. 45-3, p. 40).

The fifth *Knight* factor examines duration of job commitment. *Knight*, 950 F.2d at 379. It is well established that Session was a temporary employee at Elite Staffing, hired by Elite, but placed at Menasha. (Doc. 45-3, p. 114). Menasha did not require Session to work a certain number of hours and did not require her to abide by an attendance policy. (Doc. 45-3, p. 155). These facts weigh against a finding of joint employment. *See Frey*, 903 F.3d at 680 (finding in evidence of joint employer status with respect to the fifth factor because "[t]his was *not* a temporary assignment or a contract

job that would end at the completion of some task"); *Love*, 779 F.3d at 705 (finding that the fifth factor weighed against the plaintiff where it was undisputed that he worked on a project overseen by the general contractor for only eight months and intended to remain employed by the subcontractor, not the general contractor, upon completion of the project).

Based on our application of the five-factor test, Session cannot demonstrate that Menasha "exert[ed] significant control" over her to be deemed a joint employer. *NLRB v. W. Temp. Servs. Inc.*, 821 F.2d 1258, 1266 (7th Cir. 1987). Thus, summary judgment is appropriate. Nevertheless, the Court will still ensure that the arguments made by Menasha properly substantiate their assertions of entitlement to summary judgment.

## II.   Title VII

### a. Hostile Work Environment

Although Session's amended complaint was "not eloquently stated", the Court allowed for her cause of action to proceed and subsequently divided it into two counts: the first being a claim for hostile work environment under Title VII of the Civil Rights Act of 1967 (Doc. 18). Menasha purports that even if Session can establish that Menasha was her employer, her sexual harassment claims fail as a matter of law because she cannot establish a *prima facie* case.

To state a prima facie case of hostile work environment, the Plaintiff must show that (1) the work environment was subjectively and objectively offensive; (2) the harassment complained of was based on gender; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability. *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 627 (7th Cir. 2019). To rise to the level of a hostile work environment, the

conduct must be sufficiently severe or persuasive to alter the conditions of employment, such that is creates an abusive relationship. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). Although this conduct does not need to be expressly sexual, it must be of a sexual character. *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999). Several considerations play into whether an environment is hostile: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Casino Queen*, 739 F.3d at 982.

In her narrative-style complaint, Session asserts that Tandy's behavior was offensive; however, she does not offer any evidence to show that the behavior was *objectively* offensive, thereby failing to demonstrate the first prong. The staring, pointing, and laughing Session describes in her complaint do not in and of themselves implicate any negative attitude toward females because they are not sexual in nature. *See Hardin*, 167 F.3d at 345 (brief touching, approaches from behind in an electric cart, cutting off in parking lot, and door slammed in the face are not sexual in nature nor sufficiently severe to give rise to a hostile environment); *Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998) (no hostile environment when coworker briefly touches, pokes, and directs ambiguous comments at plaintiff). In light of the foregoing, Session also fails on the second prong.

With respect to the third prong, isolated incidents of physical contact and staring are generally not severe or pervasive enough to allow an inference of an objectively hostile environment. *Schmidt v. Canadian Nat'l Ry. Corp.*, 232 Fed. Appx. 571, 574 (7th Cir. 2007) (finding that isolated incidents of rubbing plaintiff's shoulders, use of vulgar

language, and staring suggestively at the genital area were too insignificant to create a hostile work environment); *Hambrick v. Kiljakazi*, 79 F.4th 835, 843 (7th Cir. 2023) (finding that everyday work disagreements taking place over several years did not create a hostile work environment when considered in combination). Insults, personal animosity, and juvenile behavior are also insufficient evidence of a hostile work environment. *Brooks v. Avancez*, 39 F.4th 424, 441 (7th Cir. 2022). While courts certainly do not condone such behavior, and recognize that a series of separate, isolated acts can collectively add up to a hostile work environment, occasional incidents of shoulder rubbing, staring, laughing, and yelling at Session, when considered together are too insignificant to create a hostile work environment, especially when Session has never spoken to the person who purportedly committed the harassing acts. (Doc. 45-3); *See Brooks*, 39 F.4th at 441.

Session has also alleged that Menasha was aware of Tandy's conduct and failed to take reasonable remedial action; however, as demonstrated *infra,* Menasha was not Session's employer, Elite Staffing was Session's employer. Accordingly, Session fails on the fourth prong. As such, summary judgment is proper as to Session's hostile work environment claim.

### b. Retaliation

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* as amended, prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. Title VII forbids an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions or privileges of employment, because of

such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e(2)(a).

In its threshold review, the Court deduced that Session claimed Menasha retaliated against her through subsequent termination after making claims of harassment and discrimination to her managers, the Madison County Courts, and the Pontoon Beach Police Department. (Doc. 18).

There are two different ways to make a *prima facie* showing of retaliation, the direct method and the indirect method. *Boss v. Castro,* 816 F.3d 910 (7th Cir. 2016). Regardless of which method a plaintiff attempts to proceed under, she must show that she suffered a materially adverse employment action. *Lewis v. City of Chicago,* 496 F.3d 645, 652-53, (7th Cir. 2004). In the present case, Session was terminated from her employment, so she clearly incurred an adverse employment action.

A Title VII plaintiff proceeding under the direct method of retaliation must show that (1) she engaged in protected activity; (2) she suffered a materially adverse employment action; and (3) there was a causal link between the protected activity and the adverse action. *Harden v. Marion County Sheriff's Dept.*, 799 F.3d 857, 861-862 (7th Cir. 2015) (citing *Colman v. Donahoe,* 667 F.3d 835, 845 (7th Cir. 2012). In other words, there must be "some direct relation between the injury asserted and the injurious conduct alleged" that is neither "too remote, purely contingent, or indirect." *Staub v. Proctor Hosp.,* 131 S.Ct. 1186, 1192 (2011). To prove retaliation under the indirect method, a plaintiff must show that (1) she engaged in protected activity; (2) she suffered a materially adverse employment action; (3) she was meeting his employer's legitimate expectations; and (4) she was treated less favorably than similarly-situated employees

who did not engage in protected activity. *Harden,* 799 F.3d at 862 (citing *Argyropoulos v. City of Alton,* 539 F.3d 724, 733 (7th Cir. 2008)).

The first two elements of proof are the same under either the direct or indirect methods. While it is clear that Session engaged in protected conduct by being a female who filed complaints of harassment on her own behalf to her managers and outside entities and later suffered a materially adverse employment action, i.e. termination, she still cannot prevail under either scenario as she cannot prove the remaining elements. Under the direct method, Session cannot show a causal connection between the filing of the grievance(s) with her subsequent termination. Alternatively, under the indirect method, she cannot show that she was meeting job expectations and was treated less favorably than similarly situated employees. Indeed, she provides no facts to support either scenario.

Assuming arguendo that Session has fulfilled the elements under either scenario, her cause of action for retaliation still fails.[1] Indeed, under both methods, once a *prima facie* case is established, a presumption of retaliation is triggered, and the burden shifts to the employer to articulate some legitimate, nonretaliatory reason for its action. *Id.* (citing *Coleman v. Donahoe,* 667 F.3d 835, 845 (7th Cir. 2012). Here, Elite was responsible for Session's termination, not Menasha. Therefore, summary judgment is proper on Session's retaliation claim.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** the Motion for Summary Judgment filed by Defendant, Menasha Corporation. This action is **DISMISSED with**

---

[1] This Court does not concede that all of the elements under either method have been satisfied.

**prejudice** and the Clerk of Court is **DIRECTED** to close this case and enter judgment accordingly.  As such, all pending court dates are cancelled and terminated.

**IT IS SO ORDERED.**

**DATED:** <u>April 9, 2024</u>

/s/ *Stephen P. McGlynn*
**STEPHEN P. McGLYNN**
**U.S. District Judge**
